# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tim George, Charles and Jamie Gibbs,
William and Corie Connelly, Galen and Leslie
Satterlee, Gail Henrichsen, Dustin and Martha
Barnett, Dave and Holly Marcus, Kelly Babb,
and Gary and Elsa Overstreet, individually
and on behalf of all others similarly situated,

        Plaintiffs,

    v.

Uponor Corporation, Uponor Group,
Uponor, Inc., Wirsbo Company, and
Uponor Wirsbo Company,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-249 ADM/JJK

---

Robert K. Shelquist, Esq., Lockridge Grindal Nauen, PLLP, Minneapolis, MN; Shanon J.
Carson, Esq., and Lawrence Deutsch, Esq., Berger & Montague, PC, Philadelphia, PA; J.
Randall Jones, Esq., Kemp, Jones & Coulthard, LLP, Las Vegas, NV; Scott K. Canepa, Esq., and
Terry W. Riedy, Esq., Canepa, Riedy & Rubino, APC, Las Vegas, NV; Shawn M. Raiter, Esq.,
Larson King, LLP, St. Paul, MN; Charles J. LaDuca, Esq., Cuneo Gilbert & LaDuca, LLP,
Washington, DC; Charles E. Schaffer, Esq., Levin Fishbein Sedran & Berman, Philadelphia, PA;
Michael A. McShane, Esq., Audet & Partners, LLP, San Francisco, CA; P. Kyle Smith, Esq.,
Lynch, Hopper Salzano & Smith, LLP, Las Vegas, NV; Troy L. Isaacson, Esq., Maddox,
Isaacson & Cisneros, LLP, Las Vegas, NV; James D. Carraway, Esq., Carraway & Associates,
LLC, Las Vegas, NV; Kenneth S. Kasdan, Esq., Kasdan Simonds Weber & Vaughan LLP,
Irvine, CA; and Graham B. LippSmith, Esq., Girardi Keese, Los Angeles, CA, on behalf of
Plaintiffs.

John R. Schleiter, Esq., Howard L. Lieber, Esq., and Daniel W. Berglund, Esq., Grotefeld,
Hoffmann, Schleiter, Gordon & Ochoa, LLP, Chicago, IL, and Minneapolis, MN, on behalf of
Defendants.

---

# I.  INTRODUCTION

    On October 3, 2013, the undersigned United States District Judge heard oral argument on

Defendants Uponor Corporation, Uponor Group, Uponor, Inc., Wirsbo Company, and Uponor

Wirsbo Company's Motion to Dismiss [Docket No. 107] and on Uponor Corporation's Motion to Dismiss for Lack of Personal Jurisdiction [Docket No. 131] ("Jurisdiction Motion"). Plaintiffs oppose both motions. For the reasons stated herein, Defendants' Motion to Dismiss is granted in part, and Uponor Corporation's motion to dismiss for lack of personal jurisdiction is granted in part.

## II. BACKGROUND

Defendant Uponor Corporation ("Uponor Corp.") is the Finland-based parent company of several subsidiaries in the business of designing, manufacturing, and selling plumbing systems and other plumbing products worldwide. Defendant Uponor, Inc., one of the subsidiaries, is organized under the laws of Illinois and has its principal place of business in Apple Valley, Minnesota. Uponor, Inc. is the successor to Defendants Wirsbo Company and Uponor Wirsbo Company. Am. Compl. ¶¶ 14-21 [Docket No. 103] ("Complaint").

This putative class action relates to plumbing fittings sold by Defendants for use in homes. In past decades, commercial and residential potable water systems largely used copper piping. Compl. ¶ 28. Over time, plumbing product manufacturers, including Defendants, began selling plumbing systems made with non-copper products. One copper alternative is cross-linked polyethylene, a plastic polymer known as "pex." Defendants developed and sold pex products under various trade names, advertising these products as being more durable and affordable than copper products. Id. ¶¶ 32-34, 37. Specifically, Defendants sell a pex-based plumbing system that uses brass fittings designed to conform to ATSM manufacturing standards

F877, F1960, and F2080 (the "Components").[1]  Id. ¶ 35.  Brass is a metal alloy primarily made of copper and zinc, though its exact composition may vary.  In this case, Defendants made the Components with "yellow brass," a type of brass composed of at least 15% zinc, or which is otherwise vulnerable to "dezincification."  Id. ¶¶ 36-39.  Dezincification is a form of chemical corrosion in which zinc leaches out of the alloy, resulting in a softer and more porous metal structure.  Oxford English Dictionary (Online ed. 2013).

Plaintiffs are a group of homeowners living in New Mexico, Arizona, and California who own homes with plumbing systems that rely or relied on the Components sold by Defendants.  Plaintiffs allege the Components installed in their homes began exhibiting dezincification upon exposure to water, the very liquid plumbing systems are designed to convey.  Compl. ¶ 39.  Because of this defective design, Plaintiffs allege, they have suffered, or are "reasonably certain to suffer," corrosion of their plumbing fittings, lead leaching into their potable-water delivery systems, plumbing blockages, reduced water flow or loss of pressure, loss of function, loss of structural integrity, and other damage to their property, appliances, and building components.  Id. ¶ 91.

Plaintiffs allege Defendants knew of the Components' defective design.  When Defendants marketed their pex plumbing systems, Plaintiffs allege, Defendants falsely advertised the Components' quality and falsely represented testing the Components for reliability.  Similarly, Defendants falsely advertised the Components as comporting with the ASTM F877,

---

[1]  ASTM International, an entity formerly known as the American Society for Testing and Materials, issues thousands of manufacturing standards for various products with the goal of ensuring product standardization and quality.  See generally ASTM International - Standards Products, http://www.astm.org/standard/.

F1960, and F2080 manufacturing standards.  Thus, Plaintiffs allege Defendants knowingly

misled consumers, suppliers, and contractors regarding the quality and reliability of the

Components.  Id. ¶¶ 48-66.  Plaintiffs also allege Defendants withheld critical information from

consumers regarding the tendency of the Components to suffer dezincification due to their

yellow brass composition.  Id. ¶¶ 67-73.

Plaintiffs have alleged eleven causes of action.  As a putative national class, Plaintiffs

state claims for: (1) breach of implied warranties of fitness for particular purpose,

merchantability, habitability, quality, and workmanship; (2) breach of express warranties; (3)

negligence, including negligent misrepresentation, failure to warn/instruct, negligent selection,

and negligent installation; (4) strict products liability; (5) unjust enrichment; and (6) declaratory

and injunctive relief.

Plaintiffs also state several claims on behalf of putative state subclasses, for: (7) violation

of the New Mexico Unfair Practices Act; (8) violation of the Arizona Consumer Fraud Act; (9)

violation of the standards for residential construction under California Civil Code § 896(a)(15);

(10) violation of the California Consumer Legal Remedies Act; and (11) violation of the

California Unfair Competition Law.

This action represents only one part of a series of lawsuits relating to Defendants'

products.  Of particular relevance, in 2009, several putative class representatives brought claims

against Defendants and related entities regarding the ASTM F1807 brass fittings in Defendants'

pex plumbing systems.  Those claims were consolidated into a multi-district litigation (MDL)

assigned to this Court.  Under the supervision of Magistrate Judge Jeffrey J. Keyes, the parties

reached a national settlement in 2012.  See In re Uponor, Inc., F1807 Plumbing Fittings Prods.

Liab. Litig., 716 F.3d 1057, 1060-62 (8th Cir. 2013).

In the meantime, various homeowners filed suit against Defendants and other parties in connection with other plumbing products, including the Components.  Plaintiff Tim George filed this action on January 31, 2012, and other plaintiffs filed similar suits both before and after George.  See In re: Uponor, Inc., F1960 Plumbing Fitting Prods. Liab. Litig., MDL No. 2393, at 1 (J.P.M.L. Sept. 27, 2012).  By June 2012, at least 19 actions had been filed against Defendants and other parties in 7 districts, and George sought to consolidate these actions into multi-district litigation. Id. at 1, 5-6.  The Judicial Panel on Multi-District Litigation (the "JPML") held that the various actions, though sharing factual allegations related to the F1960 fittings, did not sufficiently overlap to make centralization efficient.  In addition, the actions had progressed at different paces, including a group of cases in the District of Nevada that had progressed further than most of the others.  Id. at 2.  Thus, the JPML denied George's request but encouraged the parties to voluntarily coordinate litigation.  Id. at 3.  To that end, several plaintiffs have joined George by either transferring their actions to this district or by filing their action in Minnesota in the first instance.[2]

On June 24, 2013, Defendants moved to dismiss the Complaint under Rule 12(b) of the Federal Rules of Civil Procedure.  On August 9, 2013, Uponor Corp., the Finland-based parent company of the other Defendants, moved separately to dismiss itself from this action due to a lack of personal jurisdiction.

---

[2] See Gibbs v. Uponor Corp., No. 12-2631 ADM/JJK (transferred from Southern District of Illinois), Shons v. Wirsbo, Co., No. 12-2837 ADM/JJK (transferred the Western District of Oklahoma), Fofi v. Uponor, Inc., No. 12-2908 ADM/JJK (transferred from Middle District of Pennsylvania); Patel v. Uponor Corp., No. 12-1882 (alleging claims on behalf of Texas homeowners); Overstreet v. Uponor N. Am., Inc., No. 13-323 (alleging claims on behalf of California homeowners); Gasway v. Uponor Corp., No. 13-803 (transferred from Central District of California).

## III.  DISCUSSION

**A.  Uponor Corp.'s Motion to Dismiss for Lack of Jurisdiction**

When a party moves to dismiss for lack of personal jurisdiction, the district court may consider factual evidence outside of the pleadings.  See, e.g., Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991).  The plaintiff has the burden of establishing jurisdiction, but need not prove jurisdiction by a preponderance of the evidence until an evidentiary hearing or trial.  Id.  Instead, "[t]o survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant."  Digi-Tel Holdings, Inc. v. Proteq Telecomms, 89 F.3d 519, 522 (8th Cir. 1996).  The facts offered will be viewed in the light most favorable to the plaintiff.  Dakota Indus., 946 F.2d at 1387.

**1.  Applicable Personal Jurisdiction Law**

A court has personal jurisdiction over a party only if both the forum state's long-arm statute and the Due Process Clause fairly allow the exercise of jurisdiction.  Minnesota's long-arm statute is "coextensive with constitutional limits," and does not require separate consideration so long as federal due process requirements are met.  Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006).

An exercise of personal jurisdiction will satisfy due process if the defendant has had sufficient contacts with the forum state, such that it "should reasonably anticipate being haled into court there . . . and maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Miller v. Nippon Carbon Co., Ltd., 528 F.3d 1087, 1090-91 (8th Cir. 2008) (quotation omitted).  The Eighth Circuit Court of Appeals has stated a five-part test for measuring whether these "minimum contacts" exist:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 819 (8th Cir. 1994).  "The first three factors are of primary importance."  Id.

Whether the exercise of personal jurisdiction is "specific" or "general" turns on the third factor.  If the dispute arises from the defendant's contacts with the forum state, the court may exercise specific personal jurisdiction.  If the dispute is unrelated to the defendant's contacts with the forum state, the contacts must be "continuous and systematic" to justify the application of general personal jurisdiction.  Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 595 (8th Cir. 2011) (quotation omitted).  For parent corporations, the analysis does not necessarily end there.  Personal jurisdiction may apply to a nonresident corporation based on the actions of its in-state subsidiary.  See Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 648-49 (8th Cir. 2003); Anderson v. Dassault Aviation, 361 F.3d 449, 452 (8th Cir. 2004).

### 2.  Jurisdiction Over Uponor Corp.

In its motion to dismiss, Uponor Corp. argues that none of the three possible avenues to personal jurisdiction—general, specific, or parent-subsidiary—apply in this case.  Uponor Corp. first argues that Plaintiffs cannot establish general jurisdiction, because Uponor Corp. has no physical presence in Minnesota, let alone such a systematic and continued presence so as to warrant being subject to jurisdiction in this forum for any claim.  Next, Uponor Corp. argues Plaintiffs have also failed to demonstrate how the corporation has had the minimum contacts necessary to justify specific personal jurisdiction, as Uponor Corp. states it did not itself design, manufacture, or sell the Components in Minnesota or the United States.  Finally, Uponor Corp.

argues Uponor, Inc. is not an alter ego, meaning Plaintiffs may not pierce Uponor, Inc.'s corporate veil to establish jurisdiction over Uponor Corp.

In response, Plaintiffs largely blur their jurisdictional analyses.  Plaintiffs argue that: Uponor Corp. "played a direct role" in the operation of Uponor, Inc.'s Apple Valley, Minnesota, facility; Uponor Corp. designed, manufactured, and sold the defective Components "through" its subsidiary Uponor, Inc.; and that Uponor Corp. itself had "continuous and systematic business contacts throughout the United States."  See Pls.' Mem. Opp'n Juris. Mot. [Docket No. 140] at 14, 20-21, 28.  In short, although Plaintiffs state specific and general jurisdiction are "two different sides of the same coin," they flip between the two without clear delineation.  Id. at 26. Throughout their arguments, however, Plaintiffs maintain a consistent position: personal jurisdiction should exist over Uponor Corp. because of its close ties to and operation of Uponor, Inc.  To that end, Plaintiffs submit various annual report excerpts and other evidence to demonstrate Uponor, Inc. operates as an extension of Uponor Corp.

Uponor Corp., standing alone, is not subject to general personal jurisdiction.  Typically, for general jurisdiction to apply to a corporation, the corporation must have some degree of physical or business "presence" in the forum state.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416-18 (1984) (evaluating defendant's office and facility locations, licensing, and business in forum state to determine existence of general jurisdiction); Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011) (holding court may assert general jurisdiction when corporation has sufficient contacts to "render them essentially at home in the forum state").  Beyond unsupported arguments, Plaintiffs have offered no evidence indicating Uponor Corp. has facilities in Minnesota, is licensed to do business in Minnesota, or otherwise has regular, continuous contacts with Minnesota.  Absent such evidence, the Court

declines to exercise general jurisdiction.

Similarly, Plaintiffs have not established specific personal jurisdiction over Uponor Corp. The parties both discuss the United States Supreme Court's decision in <u>Goodyear</u> in debating whether Uponor Corp.'s placing of products into the stream of commerce may establish jurisdiction. The Eighth Circuit has recognized a stream of commerce theory of jurisdiction where a corporation "pours its products into a regional distributor," expecting these products to reach a discrete trade area. <u>Viasystems</u>, 646 F.3d at 597 (internal quotation omitted). In such cases, the fora within the trade area may exercise jurisdiction over the foreign corporation. <u>Id.</u> The Eighth Circuit has been "careful to note" that stream of commerce jurisdiction is "a type of specific jurisdiction (as opposed to general jurisdiction)." <u>Id.</u> (quoting <u>Barone v. Rich Bros. Interstate Display Fireworks Co.</u>, 25 F.3d 610, 613 (8th Cir. 1994)).

Plaintiffs have not demonstrated a stream of commerce sufficient to establish specific jurisdiction over Uponor Corp. Plaintiffs argue Uponor Corp. has distributed plumbing products worldwide, including in the United States and Minnesota, thereby "purposefully availing" itself of the forum's laws. But this argument focuses on Uponor Corp.'s use of Uponor, Inc. as an extension of its business. Plaintiffs are not arguing Uponor Corp. should be subject to specific jurisdiction because it is the head of a distribution network or otherwise ships or sells goods to Minnesota. Instead, Plaintiffs argue Uponor Corp. treats Uponor, Inc. as an extension of its business, and that Uponor, Inc. has used Uponor Corp.'s assets and designs to manufacture and sell the Components. <u>See, e.g.</u>, Pls.' Mem. Opp'n Juris. Mot. at 29. The distinction is significant. <u>See Viasystems</u>, 646 F.3d at 596 (stream of commerce jurisdiction "should be kept conceptually separate" from jurisdiction through a subsidiary). Plaintiffs are not looking to establish specific jurisdiction over Uponor Corp. because of products it makes and ships to a

Minnesota distributor; on the contrary, Plaintiffs concede Uponor, Inc. manufactures and sells the Components at issue.  Instead, Plaintiffs argue because Uponor Corp. uses Uponor, Inc. as a continuation of its own business, Uponor Corp. should be subject to jurisdiction through its subsidiary.  That is a separate analysis addressed immediately below.  Plaintiffs have not established specific jurisdiction over Uponor Corp.

Ultimately, whether personal jurisdiction exists over Uponor Corp. depends on its relationship to Uponor, Inc., a subsidiary that does not dispute the Court's jurisdiction in this action.  Uponor Corp. argues that for Plaintiffs to establish jurisdiction via this subsidiary, Plaintiffs must demonstrate Uponor Corp. "so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego." Viasystems, 646 F.3d at 596.  But Uponor Corp. overstates Viasystems' holding.  There, the Eighth Circuit held that while a degree of "control and domination" by the parent over the subsidiary was necessary, rigid satisfaction of the alter ego test was not.  See id. at 596 (citing Anderson, 361 F.3d 449).

In evaluating whether a parent sufficiently controls a subsidiary to warrant exercising jurisdiction, courts have considered a number of factors.  In Viasystems, the court held against finding jurisdiction in part because the parent company's ownership interest in the subsidiary was "confined to a two-steps-removed 28–percent interest." Id. at 597.  In Epps, the court held the plaintiffs had failed to connect the parent to at least one of the subsidiaries at issue, and simply claiming the debts and assets of a subsidiary in SEC 10-K filings was insufficient. Epps, 327 F.3d at 650.

Conversely, in Anderson, the parent company transported a majority of its manufactured airplanes to its subsidiary in the forum state for final modification before distributing the planes

worldwide.  Anderson, 361 F.3d at 452.  The parent corporation had a "close, synergistic

relationship" with its subsidiary that transcended "mere ownership."  Id. at 453.  This was

reflected in the parent corporation's annual reports and website, in which the parent referred to

itself interchangeably with the subsidiary and touted its presence and operations in the forum

state.  Id.  The court held the parent's "symbiotic" relationship with its subsidiary, combined

with the forum state's importance to both companies, allowed the district court's exercise of

personal jurisdiction to satisfy due process.  Id. at 455.

　　　Here, Plaintiffs have introduced sufficient pleadings and evidence to establish at least a

prima facie showing of jurisdiction through Uponor Corp.'s subsidiary.  In an affidavit submitted

by its CEO and President Jyri Luomakoski, Uponor Corp. explains that several levels of

ownership separate Uponor Corp. from Uponor, Inc.  Namely, Uponor Corp. owns Uponor NA

Holdings, Inc., which owns Uponor North America, Inc., which owns Hot Water Systems North

America, Inc., which ultimately owns Uponor, Inc.  See Luomakoski Decl. [Docket No. 134] ¶

10.  Although three levels of subsidiaries exist between Uponor Corp. and Uponor, Inc., the

distance is not actually very great.  Plaintiffs allege, and Uponor Corp. does not dispute, that

each company in the chain wholly owns the company underneath it.  Thus, there is no "dilution"

in ownership between Uponor Corp. and Uponor, Inc., as the situation was in Viasystems.

　　　Perhaps more importantly, the record as it has developed thus far indicates Uponor, Inc.

operates as an extension of Uponor Corp.'s business.  As Uponor Corp.'s consolidated annual

reports demonstrate, the Uponor entities view themselves as a single enterprise divided by

geographic reporting regions, with Uponor Corp. at the head.  Berglund Decl., Sept. 3, 2013

[Docket No. 143] Ex. A (excerpt from Uponor annual report); see also Froemming v. Gate City

Fed. Sav. & Loan Ass'n, 822 F.2d 723, 733-34 (8th Cir. 1987) (filing of consolidated financial

statement a factor in finding alter ego liability).  In its reports, Uponor Corp. refers to itself and

its subsidiaries as the "Uponor Group," a single business enterprise engaged in selling plumbing

and infrastructure products worldwide.  Riedy Aff., Aug. 27, 2013 [Docket No. 141] ("Riedy

Aff.") Ex. 5, at 4.[3]  Accordingly, Uponor Corp. treats North America as simply one region of its

worldwide plumbing business.  Id. at 5 (former Uponor Corp. CEO referring to company as a

"market leader" in North America), 7 (discussing growth of pex plumbing system development

and sales in North America); Ex. 13 (describing "Uponor North America" as part of Uponor

Corp., and Uponor Corp. as employing 3,300 employees worldwide); Ex. 14 (describing North

American operations as a division of Uponor Corp.); Ex. 19 (claiming North American business

as "regional" sales); Ex. 22 (discussing Europe and North America as two different regions of

same business).

      Also, although Uponor Corp.'s website is separate from Uponor, Inc.'s website, Uponor,

Inc.'s "About Us" webpage further suggests a "symbiotic" relationship between the companies.

See Anderson, 361 F.3d at 454; Fair Isaac v. Experian Information Solutions, Inc., 650 F.3d

1139, 1150-51 (8th Cir. 2011) (noting joint operation of website as factor in alter ego analysis).

The Uponor, Inc. website states, "Uponor North America is a part of Uponor Corporation, which

also includes Uponor Nordic and Uponor Europe" and is "[l]ed by President and CEO Jyri

Luomakoski and headquartered in Vantaa, Finland." Id. at Ex. 13.

      Despite Luomakoski's declaration to the contrary, Uponor Corp. has also repeatedly

---

[3]  Uponor Corp. attempts to shift focus away from itself by arguing the submitted corporate materials refer to "Uponor" as a collective entity and not to "Uponor Corp." specifically.  But the submitted annual reports, and the sole press release, clearly identify Uponor Corp. as the issuing entity.  Further, use of the unlabeled name "Uponor" only further demonstrates how Uponor Corp. and its subsidiaries operate as a single larger enterprise as opposed to a group of separate entities with overlapping ownership.

touted its presence in Minnesota.  Riedy Aff. Ex. 6, at 14 (claiming Wirsbo—Uponor, Inc.'s

Minnesota predecessor—was Uponor Corp.'s "best-known brand" in North America, also

discussing growth of pex plumbing sales due to removal of plumbing code restrictions in

Minnesota); Ex. 13 (describing Apple Valley facility as manufacturing center in U.S.); Ex. 18

(listing Apple Valley facility as headquarters for North American "Region management"); Ex.

19 (stating Uponor Corp. "launched a factory extension project in Apple Valley, MN"); Ex. 20

(describing consolidation of manufacturing in Uponor Corp.'s "Apple Valley, Minnesota site");

Ex. 21 (stating "We opened a new distribution center in the USA, in Minnesota"); see also Ex.

12 (discussing Wirsbo Company's history and establishment of North American headquarters in

Minnesota).

     Uponor Corp. also appears to claim North American profits and liabilities as its own.

See Smith ex rel. VanBrunt v. Blitz U.S.A. Inc., No. 11-1771, 2012 WL 5413513, at *2 (D.

Minn. Nov. 6, 2012) (considering, as factor supporting alter ego liability, whether "finances

overlap").  Luomakoski avers Uponor Corp. conducts no business in the United States, and

further states Uponor Corp. is a holding corporation that does not engage in any design,

development, or sales activity whatsoever.  Luomakoski Decl. ¶¶ 4, 12-26.  But in 1999, Uponor

Corp. claimed a full fifth of its sales and 13% of its staff were in the United States.  Riedy Aff.,

Aug. 27, 2013 at Ex. 5 (Uponor 1999 financial report); Ex. 21 (discussing increase in Uponor's

North American profits in "both dollars and euro").  In January 2009, Uponor Corp. announced

it was setting aside 14.5 million euros exclusively for "the costs of residential plumbing

replacements" in the United States.  Id. at Ex. 9 (Stock exchange release issued by Uponor

Corp.).  And, in Uponor Corp.'s 2012 annual report, Luomakoski himself described Uponor

Corp.'s "ambitious R&D," its "significant market share" in the United States, and how it "stayed

committed and stayed put" in the United States through a difficult market period.  Id. at Ex. 23.

Uponor Corp.'s annual reports also state all research and developments costs jointly for

worldwide operations.  Berglund Decl., Sept. 3, 2013 at Ex. A.

Plaintiffs have established a prima facie showing of jurisdiction over Uponor Corp.,

because Uponor Corp. exercises a sufficient degree of control and domination over Uponor, Inc.

to satisfy due process.  Taken individually, no one of the above factors or items of evidence

would warrant exercising jurisdiction.  Cumulatively, however, Plaintiffs' allegations and the

evidence suggest Uponor Corp.'s relationship with Uponor, Inc. goes beyond "mere ownership,"

and more closely resembles the sort of "symbiotic" relationship discussed in Anderson.  See

Anderson, 361 F.3d at 455.  Throughout the Uponor companies' various statements, Uponor,

Inc. appears to serve as Uponor Corp.'s base of operations in the United States.  Uponor, Inc.'s

Apple Valley, Minnesota, location is repeatedly claimed as critical to Uponor Corp.'s North

American operations for everything from manufacturing to sales and training.  Thus, exercising

jurisdiction over Uponor Corp. will not offend traditional notions of fair play and substantial

justice.  See Scott v. Mego Int'l, Inc., 519 F. Supp. 1118, 1126 (D. Minn. 1981) (exercising

jurisdiction over parent company in part because subsidiary appeared to be incorporated "for the

purpose of continuing in one venture the business and management" of the parent); see also

Gorton v. Nordlund, No. A04-2516, 2005 WL 3289426, at *7 (Minn. Ct. App. Dec. 6, 2005)

(upholding jurisdiction in part because of interrelationship between parent and subsidiary in

production and sale of product at issue, and because parent operated subsidiary as a "major

division" of company and coordinated its business).

Plaintiffs have established a prima facie showing of jurisdiction sufficient to defeat

Uponor Corp.'s dismissal motion.  However, the burden remains on Plaintiffs to demonstrate

jurisdiction over Uponor Corp. by a preponderance of the evidence at trial.

### 3. Res Judicata and Collateral Estoppel

Plaintiffs also argue the Court should exercise personal jurisdiction over Uponor Corp. because the United States District Court for the District of Nevada has already done so.  Uponor Corp. raises several valid problems with applying issue preclusion in this case, including that the District of Nevada has not necessarily reached a final decision on the matter, and that the court there applied a materially different standard of law.  Because the Court finds an exercise of jurisdiction of Uponor Corp. independently appropriate, it declines to reach Plaintiffs' issue preclusion arguments.

### 4. Uponor Group

As a corollary to the above arguments, Uponor Corp. argues "Uponor Group" should be dismissed from this action because it is not an actual entity, but rather a term the Uponor companies use to refer to their larger enterprise.  In a footnote in its response, Plaintiffs state they do not oppose dismissal of Uponor Group.  Pls.' Mem. Opp'n Jurisdiction Mot. at 1 n.1.  As a result, Uponor Group is dismissed.

## B.  Motion to Dismiss for Failure to State a Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure states that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  In evaluating such a motion, the court construes the pleadings in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994) (citation omitted).  Unlike a motion to dismiss for lack of jurisdiction, the court may not consider matters outside the pleadings in connection with a Rule 12(b)(6) motion.  But, "documents necessarily embraced by the complaint are not matters outside the

pleading[s]."  Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted).

### 1.  Breach of Implied Warranty, Breach of Express Warranty (Counts 1, 2)

#### a.  Standing

As an initial matter, Defendants argue all claims in the Complaint should be dismissed because Plaintiffs lack standing to bring suit.  Standing, at its core, is a jurisdictional threshold.  A failure to demonstrate standing means the plaintiff has failed to demonstrate a case or controversy as required by Article III of the Constitution.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992).  To establish standing, a plaintiff must demonstrate: (1) an "injury in fact," which is concrete and particularized, and which is "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the complained-of conduct; and (3) it is "likely," and not "merely speculative" that a favorable decision will redress the injury.  Id. (internal quotations omitted).

For warranty claims stated under Minnesota law, a plaintiff may not simply allege that a product line contains a defect.  Rather, the plaintiff must plausibly allege her purchased product "actually exhibited the alleged defect."[4]  In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 616 (8th Cir. 2011).  In Zurn, the Eighth Circuit reviewed the plaintiffs' standing to bring warranty claims for defective pipe fittings manufactured by Zurn Pex, Inc.  The plaintiffs alleged—and later introduced evidence demonstrating—that all pipe fittings in the product line developed stress corrosion cracking ("SCC") upon exposure to water.  Id. at 617.  The court held

---

[4] In this case, the parties agree the Components are covered by an express warranty that adopts Minnesota law.  See Pls.' Mem. Opp'n Mot. Dismiss [Docket No. 129] at 15.  To the extent the parties contend a different state's laws should apply, it is discussed in Section B.2.a., below.

such cracking sufficiently exhibited the alleged defect to confer standing.  Id.

In addition, the plaintiffs did not need to demonstrate any "external damage" to have standing, meaning even "dry plaintiffs" who had not yet suffered leaking pipes could pursue breach of warranty claims.  The rationale was the plaintiffs had established stress corrosion cracking as a "universal inherent defect" occurring after any normal use, meaning all plaintiffs owning these products necessarily had standing to pursue a breach of warranty claim.  This differed from plaintiffs whose products only had a chance of developing a defect in the future. Id.; cf. Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 862 (D. Minn. 2012).  The district court in Thunander found a lack of standing in part by applying Zurn.  There, the plaintiffs alleged owning pipe fittings "at risk" for a defect, but offered no plausible facts suggesting the defect actually existed in their home.  Thunander, 887 F. Supp. 2d at 862.  Had plaintiffs alleged testing their pipes and finding the defect, the court suggested, the plaintiffs might have survived dismissal.  Id.

Here, Defendants argue the putative class representatives have failed to allege plausible facts showing a defect in their Components.  In the Complaint, Defendants argue, Plaintiffs have broadly alleged the Components are vulnerable to dezincification and thus likely to fail at some point in the future; Plaintiffs have failed to allege owning actually defective products.  If Plaintiffs intended to state a claim for threatened injury, they needed to allege a "certainly impending" injury, which they have not done.  See Harrison v. Leviton Mfg. Co., Inc., No. 05-cv-0491-CVE-FHM, 2006 WL 2990524, at *2 (N.D. Okla. Oct. 19, 2006) (quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1155 (10th Cir. 2005)).  In addition, Defendants argue dezincification by itself does not qualify as a manifestation of a defect under Zurn because Plaintiffs' plumbing systems could continue functioning normally for years or even decades into

the future.

Plaintiffs respond that their allegations have sufficiently demonstrated a manifestation of the defect.  Plaintiffs compare their allegations to those stated in <u>Zurn</u>: the Components' yellow brass composition makes them universally susceptible to dezincification, which in turn is "substantially certain" to lead to "corrosion, plumbing blockages," leaks, cracks, and property damage.  Compl. ¶ 46.  Like the class representatives in <u>Zurn</u>, Plaintiffs argue that because they have not yet suffered leaks or other property damage does not mean they have failed to demonstrate a manifestation of the alleged defect.  Instead, the inherent nature of the Components' defect means all Plaintiffs have already experienced a product failure sufficient to establish standing.

In making their arguments, the parties confuse the difference between standing and the economic loss doctrine (also referred to as the "economic loss rule").  Standing is a threshold jurisdictional issue, requiring a plaintiff to establish an actual injury suffered as the result of the defendant's conduct.  In contrast, the economic loss rule is a court-made doctrine barring recovery for a tort claim where the plaintiff suffers a purely economic loss; it is an attempt to prevent contract law from "drown[ing] in a sea of tort." <u>E. River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 866 (1986).  The economic loss rule prevents a plaintiff from bringing a tort claim where the damages sought consist only of damages to the product itself, or of some other loss in only the product's value.[5]  <u>See, e.g.</u>, Minn. Stat. § 604.101.  Thus, the economic loss rule bars certain claims even where a plaintiff has indisputably stated an actual, economic injury.

---

[5] Often, such claims are better brought as contract claims, as the parties have already bargained for economic risk through their transaction.  <u>See</u> <u>Transamerica Delaval</u>, 476 U.S. at 872-73.

In this case, Defendants argue Plaintiffs have failed to allege any actual injury (a matter of standing) and also that Plaintiffs have failed to allege any recoverable damages resulting from their alleged injury (a matter relevant to the economic loss doctrine).  As discussed, Eighth Circuit law requires only the manifestation of a defect to bring a warranty claim; the law does not require suffering "external damage."  Zurn, 644 F.3d at 617.  Plaintiffs' standing to bring a warranty claim is evaluated here.  Whether the economic loss doctrine bars Plaintiffs' remaining claims—related to their other damages from dezincification—is discussed separately below.

Plaintiffs' allegations regarding their experiences with dezincification are frustratingly imprecise.  Throughout the Complaint, Plaintiffs refer to themselves as a nameless group, without ever identifying which specific injuries, if any, each Plaintiff suffered.  It appears some Plaintiffs have not actually experienced any dezincification or corrosion in their homes, as the Complaint frequently alludes to Plaintiffs with Components that are "in the process of failing"—but that have not yet failed, and Plaintiffs who are "reasonably certain" to suffer injury—but have not yet suffered such injury.  See, e.g., Compl. ¶¶ 46, 88.  The Complaint is also vague regarding the propensity of the yellow brass Components to manifest defects.  Plaintiffs refer to the Components as "susceptible to premature failure," "substantially certain to fail," having a "tendency" to fail, having a "propensity" to crack, and being "prone" to premature degradation.  Id. ¶¶ 40, 45, 68, 69, 70, 79.

Even viewed in the light most favorable to Plaintiffs, the only logical conclusion is that not all Plaintiffs have suffered a manifestation of the alleged defect.  The majority of Plaintiffs rely on vague, deliberately obtuse allegations relating to the likelihood of their Components to exhibit dezincification in the future.  At no point in the Complaint do the majority of Plaintiffs specifically allege that they personally have experienced dezincification or any other

manifestation of a defect.  Similarly, Plaintiffs have not alleged that <u>all</u> Components made by

Defendants inevitably manifest defects upon any normal use.  Although Plaintiffs allege

suffering damages in a conclusory manner, their factual allegations regarding dezincification are

stated as "propensities" and "susceptibilities."  Standing requires "actual" injury, not "likely"

injury.  Had Plaintiffs alleged plausible facts indicating that every Component made by

Defendants will manifest the defect, they might all have established standing to proceed.[6]

At this time, only Plaintiffs George and Charles and Jamie Gibbs have actually alleged

suffering dezincification and other manifestations of the defect, and thus have standing for their

warranty claims.  The remaining Plaintiffs have not plausibly alleged suffering any actual

manifestation of the defect, meaning they lack standing to pursue not only their warranty claims

but all other claims in this action.  Put in its simplest terms, without suffering from

dezincification, these Plaintiffs cannot pursue damages for leaky pipes or other harms caused by

dezincification.  Plaintiffs William and Corie Connelly, Galen and Leslie Satterlee, Gail

Henrichsen, Dustin and Martha Barnett, Dave and Holly Marcus, Kelly Babb, and Gary and Elsa

Overstreet are dismissed without prejudice from this action.  Unless otherwise stated, the

remainder of this Order addresses only the remaining Plaintiffs.

### b.  Pre-Suit Notice

Defendants argue that even if Plaintiffs establish standing for their warranty claims,

Plaintiffs fail to allege providing Defendants with pre-suit notice of the claimed defects.

Minnesota Statute § 336.2-607(3)(a), an adoption of the Uniform Commercial Code (UCC),

---

[6] Plaintiffs do allege testing "[f]ittings from Plaintiffs' homes" and confirming the effects of dezincification.  But Plaintiffs fail to allege which homes, and Plaintiffs do not allege that based on this testing they concluded that all of the Components made by Defendants will exhibit defects.  <u>See</u> Compl. ¶¶ 75, 80.

states "[w]here a tender has been accepted . . . the buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Thus, for a plaintiff to bring a warranty claim for a product governed by the UCC, the plaintiff must first provide notice to the seller of the claimed breach.  See Christian v. Sony Corp. of Am., 152 F. Supp. 2d 1184, 1187-88 (D. Minn. 2001).

The notice requirement serves three purposes.  "First, notice provides the seller a chance to correct any defect.  Second, notice affords the seller an opportunity to prepare for negotiation and litigation.  Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them."  Church of the Nativity of Our Lord v. WatPro, Inc., 491 N.W.2d 1, 5 (Minn. Ct. App. 1992), overruled on other grounds, Ly v. Nystrom, 615 N.W.2d 302 (Minn. 2000).  Minnesota courts have held sufficiency of the notice requirement for a breach of warranty claim "is a jury question."  Id.  Further, the requirement "is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy."  Id. (quotation omitted).

Defendants argue Plaintiffs failed to allege sending proper notice before the start of this litigation, meaning their warranty claims should fail.  Plaintiffs respond by submitting a letter dated January 26, 2012, in which George's counsel notified Uponor, Inc. of his warranty claim. Shelquist Aff., Aug. 5, 2013 [Docket No. 130] Ex. 1.  Plaintiffs also argue that while Minn. Stat. § 336.2-607(3)(a) requires pre-suit notice, it does not require plaintiffs to plead such notice in their complaint.  Defendants respond that even if this notice is considered, George provided it only five days before filing suit: too short of a time to achieve the purposes of advance notice.

Arguably, George's notice letter is a document embraced by the Complaint because it pertains directly to Plaintiffs' warranty claims.  As such, this letter may be considered under the

Rule 12 motion standard.[7]  Ashanti, 666 F.3d at 1150-51.  The larger issue is whether George's notice suffices under Minn. Stat. § 336.2-607(3)(a), and it does.  By itself, the statute requires a buyer to provide notice "within a reasonable time after the buyer discovers or should have discovered" any breach.[8]  Id. (emphasis added).  It does not require the buyer to provide the notice a reasonable time before filing suit.  Although George's letter provided Defendants with a limited opportunity to negotiate or prepare for suit, the letter at least preserved this purpose.  To bar Plaintiffs' warranty claim due to a last minute notice would defeat another purpose of the statute: allowing good faith consumers to pursue relief in court.  WatPro, Inc., 491 N.W.2d at 5.  To the extent Defendants maintain their challenge regarding whether notice was sufficient in this case, further factfinding, and perhaps trial, will answer the question definitively.

### c.  Timeliness

Finally, Defendants argue Plaintiffs have not stated timely warranty claims, as the four-year statute of limitations has passed since Plaintiffs received the Components.  Minn. Stat. § 336.2-725(2).  In support, Defendants cite the Complaint, in which Plaintiffs Gary and Elsa Overstreet allege purchasing their home in 2003.  Compl. ¶ 13.  Defendants also cite public records to demonstrate other Plaintiffs purchased their homes between 2002 to 2007.  See Berglund Decl., June 24, 2013 [Docket No. 110] Exs. E-I.

---

[7]  Even if it were not so embraced, because Plaintiffs will receive leave to file an amended complaint, they have the opportunity to include further allegations regarding pre-suit notice.

[8]  Plaintiffs also argue that where a Plaintiff has given notice on the defect at issue, the other Plaintiffs need not similarly establish providing notice.  The Court agrees.  See Daigle v. Ford Motor Co., 713 F. Supp. 2d 822, 827 (D. Minn. 2010) (allowing class certification where not all plaintiffs provided pre-suit notice); WatPro, 491 N.W.2d at 5 ("Where the record discloses prior knowledge of similar complaints, the defendant will already have investigated the possible causes and therefore cannot argue that it is prejudiced by any delay in receiving notice of the specific complaint.").

As Defendants' own arguments demonstrate, the issue of whether Plaintiffs have stated timely warranty claims cannot be resolved on the present allegations alone.  The dates when Plaintiffs purchased their homes are not necessarily the times when Defendants tendered the Components.  Plaintiff George alleges owning a home built in 1999, but installing Defendants' plumbing system in 2009, a time within the statute of limitations.  Compl. ¶ 10.  Whether the Gibbs have stated timely claims may similarly depend on when Defendants tendered delivery of the Components.  The issue cannot be resolved in the Rule 12 context.

In addition, Plaintiffs argue the warranty's terms extend coverage to future performance of the Components.  Minn. Stat. § 336.2-725(2) states:

> [a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Plaintiffs submit a copy of an express warranty available from Uponor, Inc.'s website, which they contend "explicitly extends" warranty coverage 25 years into the future from the date of installation.  Shelquist Aff., Aug. 5, 2013 at Ex. 2.

Plaintiffs' arguments, like those of Defendants, stray beyond the scope of Rule 12.  An express warranty would likely qualify as a document embraced by the pleadings where a plaintiff has alleged a breach of a specific warranty.  Here, however, Plaintiffs have not alleged the online warranty is the specific warranty applying to the Components installed in their homes.  Instead, Plaintiffs argue in their response memorandum that they found a warranty online by searching Uponor, Inc.'s website.  According to Plaintiffs, because this online warranty has a 2006 copyright date, its terms must have been in force over all Components for at least the past seven years.  See id.  The Court declines to apply the full force of warranty terms found on the internet

based on the assumption they <u>probably</u> apply to the parties at issue.  Also, if Defendants tendered delivery of any of the Components prior to 2006, it is impossible to determine what terms applied at that time.[9]  For the purposes of the present motion, the Complaint plausibly alleges the existence of express and implied warranties, and that these warranties cover alleged defects in the Components.  Taking these allegations as true, Plaintiff George and Plaintiffs the Gibbs' warranty claims shall survive Rule 12 dismissal.

### 2. Negligence and Strict Liability (Counts 3, 4)

In addition to their warranty claims, Plaintiffs allege two tort claims.  First, Plaintiffs allege one claim for several types of negligence, including general negligence, negligent misrepresentation, failure to warn, negligent selection, and negligent installation.[10]  Plaintiffs allege a second claim for strict product liability.  As discussed above, only Plaintiffs George and Charles and Jamie Gibbs have standing to pursue these claims.

### a. Economic Loss Doctrine

In addition to arguing Plaintiffs have failed to allege any actual injury, Defendants argue Plaintiffs have failed to sufficiently allege suffering any damages beyond purely economic loss.  In other words, even if Plaintiffs have plausibly alleged experiencing dezincification, Plaintiffs have failed to allege suffering from leaky pipes or any other kind of "external damage" resulting

---

[9]  It is for this reason that Defendants' argument regarding the express warranty's disclaiming of implied warranties also fails.  In addition, Defendants argue that assuming the online warranty applies, it compelled Plaintiffs to conduct arbitration.  Even assuming the online warranty applied, it explicitly states all class claims will be brought in the state or federal courts of Minnesota.  Shelquist Aff., Aug. 5, 2013 at Ex. 2.

[10]  Plaintiffs' tactic of grouping several disparate claims together under one count of negligence has added unneeded complexity to this litigation.  <u>See</u> Fed. R. Civ. P. 10(b) (encouraging use of separate counts to promote clarity).  The Court agrees with Defendants that Minnesota law does not recognize a claim for "negligent selection" in this context, and so dismisses this "subcount" of the Complaint with prejudice.

from dezincification. See Zurn, 644 F.3d at 617. As a result, Defendants argue, the economic loss doctrine operates to bar Plaintiffs' tort claims.

Plaintiffs argue they have alleged more than economic loss. Plaintiffs cite allegations in the Complaint which suggest Plaintiffs have suffered from leaking or restricted-flow pipes, lead contamination, and other property damage as the result of owning the Components. Plaintiffs also argue New Mexico and Arizona law allow tort claims for economic loss in this case, though Plaintiffs are silent as to California law.

Before addressing whether the economic law doctrine applies to Plaintiffs' tort claims, it must first be determined whether Minnesota law applies. For the tort claims at issue, both parties cite primarily to Minnesota law. See, e.g., Defs.' Mem. Supp. Mot. Dismiss [Docket No. 109] 17-19. And Plaintiffs agree in their memorandum, "for the purposes of this motion," Minnesota law applies to their nationwide claims. Pls.' Mem. Opp'n Mot. Dismiss at 15. However, in addition to making tort arguments under Minnesota law, the parties also offer brief parallel arguments under Arizona and New Mexico law. At oral argument, the parties conceded a choice of law analysis may be necessary. But neither party offered such analysis, and neither party argued for any law other than Minnesota law to apply. See Mot. Hr'g Tr. [Docket No. 153].

Because the parties do not object, at least at this stage of the litigation, to the application of Minnesota law, Minnesota law shall tentatively apply. See Superior Edge, Inc. v. Monsanto, Co., --- F. Supp. 2d ----, 2013 WL 4050790, at *9 (D. Minn. 2013) (holding where parties have acquiesced to a particular state's law, court need not engage in sua sponte choice of law analysis); In re Korean Air Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (8th Cir. 1991) (same); see also GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998).

However, because Plaintiffs' tort claims are ultimately dismissed without prejudice—as opposed to with prejudice—in this ruling, the parties will have the opportunity to fully address choice of law issues in subsequent motion practice. If the parties contend another state's laws should apply to any of Plaintiffs' nationwide claims, they should brief the issue in future memoranda, and certainly no later than as part of any motion for class certification.

Under Minnesota law, the economic loss doctrine bars Plaintiffs' tort claims. Minnesota has codified its version of the economic loss doctrine in Minn. Stat. § 604.101. Under this statute, a buyer of allegedly defective or misrepresented goods may not bring a tort claim "unless the goods sold . . . caused harm to the buyer's tangible personal property other than the goods or to the buyer's real property." Id. § 604.101, subd. 3. Thus, a buyer may only recover for losses related to: (1) "other tangible personal property or real property," including reasonable costs to repair or replace such property; (2) "business interruption losses," and (3) other family, personal, or household expenses incurred during the "period of restoration." Id.

Although Plaintiffs George and the Gibbs have alleged suffering economic losses, they have not plausibly alleged actually suffering from any losses or damage to their "other" tangible property or to their real property. The remaining three Plaintiffs allege discovering corrosion in the pipe-fittings of their pex plumbing systems due to dezincification, which is sufficient to establish standing for their breach of warranty claims, but not to survive the economic loss rule. Compl. ¶10; see, e.g., Daigle, 713 F. Supp. 2d at 829-30; McGregor v. Uponor, Inc., No. 09-1136, 2010 WL 55985, at *6-7 (D. Minn. Jan. 4 2010). Even if all three Plaintiffs had alleged, which they have not, that they had to replace all of the Components in their homes, they still would not have stated anything beyond economic losses. Replacement costs alone for the goods at issue are economic losses, and thus barred by the doctrine. Minn. Stat. § 604.101, subd. 3; see

also Thunander, 887 F. Supp. 2d at 871-72.

The broader allegations in the Complaint regarding damage to "other" property fail for the same reasons the majority of Plaintiffs could not establish standing. Neither George, the Gibbs, nor any other Plaintiff actually alleges suffering damage to their property from dezincification. Instead, as before, Plaintiffs state their damage allegations in broad, elusive terms. For example, Plaintiffs allege they "own, have installed, or have paid for damages" caused by the Components, and thus "have suffered or are reasonably certain to suffer" injuries, including, "without limitation," leaky pipes, restricted water flow, lead leaching into potable water, appliances breaking due to scaling and deposits, and other harms. Compl. ¶¶ 88-89. But not once, in the entire Complaint, does a Plaintiff allege actually finding a leaking or clogged pipe, or testing her water and finding lead contamination, or having to replace an appliance after finding buildup or residue. The distinction is between what "might" have happened or will "probably" happen and what has actually happened. Only allegations plausibly asserting the latter will state a viable claim. See, e.g., Thunander, 887 F. Supp. 2d at 865 ("Sweeping allegations of harm must be supported by enough facts to render them plausible and this Complaint fails to include such facts."); cf. Whitmore v. Arkansas, 495 U.S. 149, 150 (1990) (holding "allegations of possible future injury" insufficient to establish standing). Because the Complaint lacks such specific allegations, they have failed to demonstrate any losses beyond the purely economic.

### b. Particularity

Defendants also argue Plaintiffs failed to plead negligence with particularity under Rule 9(b). Plaintiffs respond that only their claims of misrepresentation must be pled with particularity, and that these claims are properly detailed.

Because Plaintiffs have failed to demonstrate anything beyond economic losses, Plaintiffs' negligent misrepresentation claims need not be addressed.[11]  However, should Plaintiffs file a second amended complaint that includes allegations of loss or damage to "other" property, negligent misrepresentation claims need not state every exacting detail.  See Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995).  In this case, Plaintiff George has alleged reliance on at least some specific representations made by Defendants, and Plaintiffs have also identified several examples of Defendants' alleged misrepresentations, though the time frame for these misrepresentations is somewhat unclear and should be clarified in any amended complaint.

### c.  Strict Liability and Exception for Lead

Plaintiffs argue their claim for strict product liability falls within a "toxic substance" exception to the economic loss doctrine.  See 80 S. Eighth St. Ltd. P'ship v. Carey-Canada, Inc., 486 N.W.2d 393 (Minn. 1992).  In 80 S. Eighth, the Minnesota Supreme Court held a claim related to a building contaminated with asbestos "is not one for economic loss" due to the specific way in which asbestos' toxic effects defeated bargained-for expectations.  Id. at 397. Even assuming 80 S. Eighth created a general exception for toxic chemicals—which is far from established—Plaintiffs have failed to allege actually suffering from such harm.  As such, this argument does not succeed.

---

[11]  Plaintiffs briefly argue Minn. Stat. § 604.10(e) makes an exception for fraud and intentional misrepresentation claims, meaning the economic loss rule should not bar their negligent misrepresentation claim, which sounds in fraud.  But Plaintiffs rely on the wrong statute.  Minn. Stat. § 604.101, the general economic loss doctrine statute enacted and effective on August 1, 2000, bars misrepresentation claims unless they allege the "misrepresentation was made intentionally or recklessly."  Plaintiffs make no such allegations here, and so their claim for negligent misrepresentation is also barred.  See Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369-71 (Minn. 2009); Smith v. Genetic Depot, Inc., No. 11-cv-273, 2013 WL 627065, at *10 (D. Minn. Feb. 20, 2013).

### 3. Equitable Relief Claims (Counts 5, 6)

#### a. Pleaded in Alternative

Along with the other claims for damages, Plaintiffs allege equitable claims for unjust enrichment and for declaratory and injunctive relief.  Defendants primarily argue these claims should be dismissed because Plaintiffs have adequate remedies at law available to them.  See United States v. Bame, 721 F.3d 1025, 1030 (8th Cir. 2013) (holding "[a] party may not have equitable relief where there is an adequate remedy at law available") (quotation omitted).  While that is true, plaintiffs may pursue equitable relief in the alternative, as Plaintiffs argue for here. See, e.g., In re Levaquin Prods. Liab. Litig., 752 F. Supp. 2d 1071, 1081 (D. Minn. 2010); Daigle, 713 F. Supp. 2d at 828.  As a result, Plaintiffs' claims for equitable relief will not be dismissed at this stage.

#### b. Particularity

Defendants also argue Plaintiffs have failed to plead unjust enrichment with particularity. It is true that where a plaintiff alleges unjust enrichment based on misrepresentations, including negligent misrepresentations, the claim must be pled with particularity.  See Chin v. Gen. Mills, Inc., No. 12-2150, 2013 WL 2420455, at *8 (D. Minn. June 3, 2013).  As discussed above, Plaintiffs have alleged negligent misrepresentation with sufficient particularity.  Thus, the unjust enrichment claim based on negligent misrepresentation will be allowed to proceed.

### 4. New Mexico Subclass Claim - New Mexico Unfair Practices Act (Count 7)

Plaintiff George brings a putative subclass claim for New Mexico residents under the New Mexico Unfair Practices Act.  See generally N.M. Stat. Ann. § 57-12-1, et seq. (the "NMUPA").  Defendants primarily argue the NMUPA requires claimants to plead with particularity, and Plaintiffs have failed to plead knowledge or actual injury with particularity in

this case.  See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1209

(D.N.M. 2011) (applying Rule 9(b) pleading requirements to NMUPA claim).

It appears the majority of New Mexico courts have not required plaintiffs to plead

NMUPA claims with particularity under Rule 9(b).  See New Mexico v. Capital One Bank

(USA) N.A., --- F. Supp. 2d. ----, 2013 WL 5874318, at *2 (D.N.M. Oct. 29, 2013) (citing Tenth

Circuit law in expressly declining to apply Rule 9(b) to NMUPA claim); Woodard v. Fidelity

Nat. Title Ins. Co., No. CIV 06-1170 RB/WDS, 2007 WL 5173415, at *6 (D.N.M. Dec. 4, 2007)

(same); Carl Kelley Const. LLC v. Danco Techs., 656 F. Supp. 2d 1323, 1347-48 (D.N.M. 2009)

(considering NMUPA claim without applying Rule 9(b) and finding plaintiff had "sketch[ed] out

a claim" under NMUPA).  Although Defendants cite Two Old Hippies, the court in that decision

applied Rule 9(b) without analysis, grouping a NMUPA claim into a larger holding regarding

misrepresentation claims.  Two Old Hippies, 784 F. Supp. 2d at 1209-10.  This Court finds New

Mexico v. Capital One and Woodard to more persuasively state the NMUPA pleading standard,

as these cases specifically addressed the issue.

Under Rule 12(b)(6) standards, Plaintiff George has stated a viable NMUPA claim.

Under the NMUPA, a plaintiff must allege four elements:

> (1) Defendant[ ] made an oral or written statement that was false or
> misleading; (2) the false or misleading statement was knowingly
> made in connection with the [sale of goods or services]; (3) the
> representation occurred in the regular course of the representor's
> trade or commerce; and (4) the representation may, tends to, or does,
> deceive or mislead any person.

Woodard, 2007 5173415, at *6 (edits in original).  Here, Plaintiffs allege Defendants made

statements, including through promotional materials, advertisements, and product markings,

regarding the quality of the Components.  See, e.g., Compl. ¶¶ 57-66.  Plaintiffs further allege

Defendants knew or should have known the Components were vulnerable to dezincification due to their yellow brass composition. Id. ¶¶ 53, 60, 65-66. Defendants allegedly made such representations as part of their normal course of business in selling plumbing systems, and these representations misled consumers as to the Components' reliability. In particular, George alleges relying on these representations through his contractor when installing Defendants' pex plumbing system in his home. Id. ¶ 56. Such allegations are sufficient for George to state a plausible claim under the NMUPA. In addition, the NMUPA allows a plaintiff to seek damages for economic loss. See, e.g., Mulford v. Altria Grp., Inc., 242 F.R.D. 615, 626 (D.N.M. 2007). As discussed, George has alleged suffering from corrosion in the Components of his home due to dezincification.

### 5. Arizona Subclass Claim - Arizona Consumer Fraud Act (Count 8)

As the only remaining Arizona Plaintiffs in this action, the burden falls on the Gibbs to allege a viable claim under the Arizona Consumer Fraud Act. Ariz. Rev. Stat. § 44-1521, et seq. ("ACFA"); see also Roby v. St. Louis Sw. Ry. Co., 775 F.2d 959, 961 (8th Cir. 1985) ("A fundamental requirement of representatives in a class action is that they must be members of the subclasses they seek to represent."). To state a claim under the ACFA, a plaintiff must show "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise." Kuehn v. Stanley, 91 P.3d 346, 351 (Ariz. Ct. App. 2004). "A plaintiff must also allege reliance—though it need not be reasonable—on the misrepresentations." Bergdale v. Countrywide Bank FSB, No. cv-12-8057-PCT-GMS, 2013 WL 105295, at *3 (D. Ariz. Jan. 9, 2013). And, the plaintiff must plead an ACFA claim with particularity. Silving v. Wells Fargo Bank, NA, 800 F. Supp. 2d 1055, 1075 (D. Ariz. 2011).

Plaintiffs have failed to allege a viable ACFA claim.  As with Plaintiff George, Plaintiffs

Charles and Jamie Gibbs have alleged suffering from dezincification and the related corrosion of

the Components in their home.  Plaintiffs as a group have also alleged Defendants made

misrepresentations regarding the quality of the Components, and subsequent economic loss,

which is a viable harm under the ACFA.  Shaw v. CTVT Motors, Inc., 300 P.3d 907, 909-10

(Ariz. Ct. App. 2013).  However, unlike George, the Gibbs never allege with particularity relying

on any of Defendants' representations.  Chronic to the Complaint is Plaintiffs' tendency to make

allegations in vague, generalized terms.  Thus, Plaintiffs allege, "Plaintiff [presumably, Plaintiff

George] his representatives, and other consumers relied on these misrepresentations."  Compl. ¶

56.  Neither the Gibbs nor any other Arizona Plaintiff specifically alleges relying on any of

Defendants' representations, even unreasonably.  Nor do they allege with particularity some

knowledge or other belief indicating they were mislead by Defendants.  As a result, the ACFA

claim is dismissed.

### 6.  California Subclass Claims (Counts 9, 10, 11)

Plaintiffs Gary and Elsa Overstreet, the only California residents in this action, failed to

establish standing.  Without standing, the Overstreets cannot pursue their stated California law

claims, and so these claims are dismissed.  See Thunander, 887 F. Supp. 2d at 863 ("A class

representative must have standing to assert claims on his or her own behalf in order to have

standing to assert claims as a class representative.").

Unlike the New Mexico and Arizona Plaintiffs, Defendants argue even if the Overstreets

had stated cognizable claims, the claims should be dismissed due to a parallel action pending in

the State of California.  The same law firm that represented the Overstreets individually, and

have now joined Plaintiffs' counsel group, also represent the plaintiffs in Sweidan v. Wirsbo

Company, No. RIC0014789 (Cal. Superior Ct. 2010).  See Berglund Decl., June 24, 2013 at Ex.

A (Complaint in Sweidan).  In that action, the plaintiffs have stated allegations relating to yellow

brass pipe fittings similar to those stated by Plaintiffs in this case.  Also, the Sweidan plaintiffs

seek class certification for a claim under Cal. Civ. Code § 896(a)(15), just as the Overstreets do

on behalf of the same California residents in this action.  See id., see also id. at Ex. C (Plaintiffs'

motion for class certification in Sweidan).  Based on the parties' representations, it does not

appear the court in Sweidan has yet ruled on class certification.

Defendants argue Sweidan necessitates the dismissal of the California subclass claims in

this action.  First, Defendants argue the subclass claims should be dismissed to avoid claim

splitting.  Second, Defendants argue, under the "first to file" rule, Sweidan takes precedence over

this action.  Finally, Defendants argue the Colorado River abstention doctrine warrants at least a

stay in this case.  See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800

(1976).

Defendants' arguments are premature.  The claim splitting doctrine, the first to file rule,

and the Colorado River abstention doctrine are all premised on the notion that the same parties

are addressing the same controversy in more than one lawsuit.  See Imation Corp. v. Sterling

Diagnostic Imaging Inc., No. 97-2475, 1998 WL 574164, at *2 (D. Minn. Apr. 21, 1998) (first to

file rule preserves judicial economy with respect to same controversy); Charboneau v. Am.

Family Ins. Co., 481 N.W.2d 19, 21 (Minn. 1992) (one party may not split its causes of action);

Scottsdale Ins. Co. v. Detco Indus., Inc., 426 F.3d 994, 997 (8th Cir. 2005) (Colorado River

abstention does not apply unless suits are parallel, and suits are parallel only if "substantially the

same parties" litigate in both suits).  These judicially-made doctrines suggest the dismissal or

stay of duplicative lawsuits in an effort to promote judicial economy and avoid conflicting

rulings.

Here, however, the Overstreets are not plaintiffs in <u>Sweidan</u>.  Also, the <u>Sweidan</u> court has not yet certified any class, meaning the Overstreets are not class members whose interests are already represented in <u>Sweidan</u>, and thus the Overstreets have not pursued identical or similar claims in more than one action.  Precluding the Overstreets' claims based on the actions of the <u>Sweidan</u> plaintiffs would deprive the Overstreets of due process.[12]  When and if the court in <u>Sweidan</u> certifies a class, the Overstreets' position may change.  In the meantime, the California subclass claims are dismissed without prejudice.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.  Defendants' Motion to Dismiss [Docket No. 107] is **GRANTED** in part and **DENIED** in part, as follows:

   a.  Plaintiffs William and Corie Connelly, Galen and Leslie Satterlee, Gail Henrichsen, Dustin and Martha Barnett, Dave and Holly Marcus, Kelly Babb, and Gary and Elsa Overstreet are **DISMISSED WITHOUT PREJUDICE**; and

   b.  Counts 3, 4, 8, 9, 10, and 11 are **DISMISSED WITHOUT PREJUDICE**.

2.  Defendant Uponor Corporation's Motion to Dismiss for Lack of Personal Jurisdiction [131] is **GRANTED** in part and **DENIED** in part, as follows: Defendant Uponor Group is **DISMISSED WITH PREJUDICE**.

---

[12]  Defendants cite <u>American Pipe & Constr. Co. v. Utah</u>, 414 U.S. 538 (1974), for the proposition that the Overstreets are "passive beneficiaries" of the proposed <u>Sweidan</u> class, and thus restricted by that action.  <u>See id.</u> at 552.  But the Court in that case held that proposed class members were only "passive beneficiaries" for the purpose of tolling the statute of limitations. The holding did not prevent a party from filing a separate suit before certification so long as their claim is independently timely.  <u>See, e.g.</u>, <u>Stutz v. Minn. Mining Mfg. Co.</u>, 947 F. Supp. 399, 404 (S.D. Ind. 1996) (noting existence of individual suit parallel to class action); <u>Rahr v. Grant Thornton LLP</u>, 142 F. Supp. 2d 793, 799-800 (N.D. Tex. 2000) (same).

3.      Plaintiffs may move for leave to amend the Amended Complaint [Docket No. 103] within 30 days of this Order.  The parties shall conduct any such motion practice in accordance with the Local Rules.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 23, 2013.